UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KETJOL MANOKU,

        Petitioner,

v.                            Case No. 09-11511

BLAINE LAFLER,              Honorable Patrick J. Duggan

        Respondent.

_____/

## OPINION AND ORDER (1) DENYING THE PETITION FOR WRIT OF HABEAS CORPUS, (2) DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY, BUT (3) GRANTING LEAVE TO APPEAL *IN FORMA PAUPERIS*

Petitioner Ketjol Manoku ("Petitioner"), a Michigan Department of Corrections prisoner currently confined at Alger Correctional Facility in Munising, Michigan, filed a pro se petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 on April 22, 2009.  In his petition, which is presently before the Court, Petitioner challenges his state-court convictions for: conspiracy to commit first-degree murder, in violation of Michigan Compiled Laws §§ 750.316(1)(a) and 750.157a; first-degree premeditated murder, Michigan Compiled Laws § 750.316(1)(a); four counts of assault with intent to commit murder, in violation of Michigan Compiled Laws § 750.83; and six counts of possession of a firearm during the commission of a felony, in violation of Michigan Compiled Laws §

750.227b.  The original habeas petition seeks relief on the following grounds: (1) Petitioner was denied a fair trial by the admission of prior "bad acts" evidence; (2) Petitioner was denied his right to present a defense when the trial court refused to instruct the jury on self-defense; (3) trial counsel was ineffective for advising Petitioner not to testify; (4) the trial court erred in sentencing Petitioner to life imprisonment without parole for the conspiracy conviction; and (5) Petitioner is entitled to a restitution hearing to resolve the amount of restitution.  (ECF No. 1.) Upon being ordered to respond to the petition, Respondent Blaine Lafler ("Respondent") filed an answer to the petition, seeking denial of the application because Petitioner's first claim is not cognizable on habeas review, the state court's rejection of claims two and three was objectively reasonable, and the state court already granted relief on claims four and five.  (ECF No. 4.)  Petitioner subsequently moved for a stay so that he could exhaust state remedies for two additional claims.  (ECF No. 6.)  The Court granted Petitioner's motion and closed this case for administrative purposes on April 19, 2010.  (ECF No. 8.)

On January 24, 2013, Petitioner moved to lift the previously-imposed stay and to amend his habeas petition with two additional claims: (6) the trial court failed to adequately ascertain whether he needed an interpreter; and (7) he was denied effective assistance of counsel by trial counsel's failure to inform the jury of his military history.  (ECF No. 14.)  On February 5, 2013, the Court granted

Petitioner's motion and re-opened this case.  (ECF No. 15.)  Respondent then filed a supplemental answer, arguing that Petitioner's recently-exhausted claims were procedurally defaulted, and, in the alternative, that the claims lacked merit.  (ECF No. 19.)  Petitioner filed a reply in which he maintained that his two new claims were not procedurally defaulted.  (ECF No. 23.)

Having thoroughly reviewed Petitioner's seven claims and the corresponding Rule 5 materials,[1] the Court concludes that Petitioner is not entitled to the issuance of the writ for the reasons given by Respondent in his briefs.  The Court will therefore deny Petitioner's application for the writ and dismiss the habeas corpus petition with prejudice.  The Court will also decline to issue a certificate of appealability.

## I.    BACKGROUND

**A.    The Trial**

Following a joint jury trial with co-defendants Oliger Merko ("Merko") and Edmond Zoica ("Zoica") in Oakland County Circuit Court,[2] Petitioner was found guilty, as charged, of: conspiracy to commit first-degree murder, in violation of

---

[1]  Rule 5 of the Rules Governing Section 2254 Cases, 28 U.S.C. foll. § 2254, specifically subdivisions (c) and (d), sets forth the respondent's obligation to submit state court materials related to the conviction and appeal challenged in any § 2254 proceeding.

[2]  The three defendants were tried jointly, but before separate juries.  A fourth co-defendant, Florjon Carcani, pleaded guilty to second-degree murder and testified against Petitioner, Merko, and Zoica.

Michigan Compiled Laws §§ 750.316(1)(a) and 750.157a; first-degree

premeditated murder, in violation of Michigan Compiled Laws § 750.316(1)(a);

four counts of assault with intent to commit murder, in violation of Michigan

Compiled Laws § 750.83; and six counts of possession of a firearm during the

commission of a felony, in violation of Michigan Compiled Laws § 750.227b.  The

convictions arose from a shooting in the parking lot of an apartment complex in

Clawson, Michigan on July 17, 2004.  The Michigan Court of Appeals provided

the following overview of the facts:

> The incident giving rise to defendant's convictions is apparently the
> culmination of a rivalry between two groups of Albanian men that
> resulted in defendant opening fire at a minivan holding five members
> of the rival group after the minivan drove into a parking lot in the late
> night hours of July 17, 2004, where defendant and his codefendants
> were standing.  Four of the minivan passengers were st[r]uck by
> bullets, one fatally, as the minivan was attempting to leave the parking
> lot.  Over the preceding couple of days, defendant, his codefendants,
> and others had met together on several occasions to watch and follow
> members of this same group of men, as well as to discuss and plan
> violent action against them.

*People v. Manoku*, No. 270880, 2008 WL 747102, at *1 (Mich. Ct.  App. Mar. 20,

2008) (unpublished).  The Court of Appeals provided the following additional facts

in its decision in co-defendant Merko's case:

> [T]he evidence revealed that [the defendants] met together on July 15,
> 2004, near a coffee shop in Royal Oak where members of the rival
> group were patronizing, for the purpose of shooting Markiol Jaku and
> Martin Vucaj, members of that rival group.  Because the shop was
> very crowded with people, the shooting did not occur.  Instead, later
> that night or the next evening, [the defendants] proceeded to watch the

4

coffee shop the rival group members were fixing up to open which was called Goodfellows.   [The defendants] were dressed in dark clothing and were in vehicles with tinted windows.  When one of the members of the rival group left the shop, coconspirator Zoica and some of his friends followed.  Zoica rolled his window down and had a handgun but did not shoot at the rival group member possibly because of heavy traffic or because they could not tail him close enough to get off a shot.

The day before the shooting, July 16, 2004, [the defendants] met at a coney island to discuss shooting members of the rival group at Goodfellows.  Later that day, they also met at Manoku's apartment to discuss the shooting.  They developed a plan to return to Goodfellows and "shoot up the people," meaning shoot members of the rival group.  Manoku would ride on the back of a motorcycle and do the shooting.  The shooting would occur the next night, July 17, 2004, the night before [Merko's] wedding.

The next day – the day of the planned shooting – they prepared for the shooting by retrieving weapons, including an AK-47 assault rifle.  The assault rifle was placed in [Merko's] vehicle.  After the motorcycle was in position for the shooting, the plan was changed and [the defendants] went to an apartment complex.  While in the parking lot, where [the defendants] were standing by their vehicle that held the AK-47, a minivan carrying rival group members pulled into the parking lot.  [Merko] quickly approached the minivan with Manoku right behind.   Shortly thereafter Manoku pulled [out] his nine millimeter handgun and opened fire, shooting four of the five people in the minivan as it was attempting to leave.  After disposing of evidence and agreeing to an alibi, [the defendants] went to Zoica's apartment and pretended to be having a party.

*People v. Merko*, No. 271800, 2008 WL 747094, at *5-*6 (Mich. Ct. App. Mar. 20, 2008) (unpublished) (alterations added).  This summary of the facts is entitled to a presumption of correctness because Petitioner has not refuted the facts of the

case with clear and convincing evidence to the contrary.  28 U.S.C. § 2254(e)(1);

*Rice v. Collins*, 546 U.S. 333, 338-39, 126 S. Ct. 969, 974 (2006).[3]

### 1.    *Prosecution Witnesses*

The main witnesses against Petitioner were Dhimiter Quafko, Martin Vucaj,

Ilirjan Dibra, Florjan Carcani, and Arjan Malushi.  Dhimiter Quafko ("Quafko")

testified that he was seated in the middle of the minivan, which he and his friends

rode in when they left the Goodfellows coffee shop on July 17, 2004, and drove to

the apartment complex in Clawson.  Quafko had seen the defendants on a previous

occasion, and he identified Petitioner and Merko at trial as the two men who

approached the minivan on the night of July 17, 2004, when Quafko and his

friends arrived at the apartment complex.

According to Quafko, Merko approached the passenger side of the van

where Martin Vucaj was seated, and Petitioner approached the driver's side of the

---

[3]  To the extent Petitioner's affidavit refutes the facts, (Reply Br., ECF No. 23), the Court cannot consider the affidavit because it is dated July 3, 2013, and apparently was never presented to the state courts.  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (holding "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits"); *see also Howard v. Holloway*, No. 1:14cv756, 2015 WL 364432, at *6 (E.D. Va. Jan. 26, 2015) (unpublished decision stating that "a petitioner generally cannot rely on his own self-serving affidavit to establish his entitlement to relief" and that the petitioner's affidavit could not be considered on habeas review because it was not part of the record before the state courts); *Sula v. Stephens*, No. H-13-1225, 2014 WL 297571, at *12 n.12 (S.D. Tex. Jan. 27, 2014) (unpublished decision citing *Pinholster* and stating that "[t]his Court cannot consider petitioner's affidavits and exhibits that were not submitted to the state court on collateral review").

vehicle where Markiol Jaku ("Jaku") was seated.  Petitioner then pulled a handgun
from his waistband, racked the gun, and pointed it at Markiol Jaku in the driver's
seat.  Jaku hesitated for a few seconds before accelerating, moving the vehicle
forward.  As the car moved, Petitioner started shooting at the van.  Jaku drove for a
short while and then slumped over and fell unconscious.

Quafko expressed some uncertainty at trial as to whether there were one or
two shooters that night, but he was sure that Petitioner had fired a gun.  Quafko
also claimed that there were no guns in the van, that he was unaware of a lead pipe
in the van until after the shooting, and that Jaku took no aggressive action before
being shot.  (1/31/06 Trial Tr. 17-47, 66-67, 74-75, 108-09, 128, 134-35, 141.)

Martin Vucaj ("Vucaj") and Ilirjan Dibra ("Dibra") corroborated Quafko's
testimony.  Vucaj testified that he was shot in the wrist during the incident on July
17, 2004, and that both Petitioner and Merko had approached the minivan when it
came into the parking lot where the shooting occurred.  Vucaj knew Petitioner, and
he claimed that, immediately before the shooting, Petitioner approached the
driver's side where Jaku was seated and Merko approached the passenger side of
the van where Vucaj was seated.  According to Vucaj, Petitioner subsequently
pulled out a gun, loaded it, and pointed it at the minivan even though Vucaj and the
other occupants of the minivan and had nothing in their hands.  Vucaj then heard a
gunshot.  (2/1/06 Trial Tr. 108-26.)

7

Six days after the shooting, Vucaj informed a police lieutenant that Petitioner had fired a gun into the minivan.  He claimed at trial that it was Petitioner who shot him and that none of the occupants of the van had anything in their hands at the time of the shooting.  (2/2/06 Trial Tr. 63, 97.)

Dibra testified that Merko had a gun in his waistband during the incident on July 17, 2014, but that it was Petitioner who took out a gun, loaded it, and pointed it at Jaku on the driver's side of the car.  Dibra was seated behind Jaku at the time and was shot in the back and elbow.  He claimed that the shot came from where Petitioner had been standing, that there were no weapons in the van, and that the van moved away after the first gunshot.  (*Id*. at 170-83, 188.)

Florjon Carcani ("Carcani") was a friend of the defendants and an accomplice to the crimes.  He pleaded guilty to second-degree murder for his role in the crimes (2/3/06 Trial Tr., morning session, 122) and testified against the defendants at trial.  Carcani explained at trial that the three defendants became angry when they learned that Vucaj and Jaku had punched Erjon Barci and Oliger Koxa (Petitioner's cousin) on July 15, 2004.  After the beating, the defendants said that they would take care of the matter.  They went looking for Vucaj and Jaku later that night, but decided not to shoot the men because the coffee shop where they found Vucaj and Jaku was too crowded.   (2/3/06 Trial Tr., morning session, 31-45.)  On the following night (July 16, 2004), the defendants developed a plan,

8

which involved Petitioner shooting members of the rival group while riding past the Goodfellows coffee shop on the back of Carcani's motorcycle.  (*Id*. at 51-65.)

Continuing, Carcani testified that, on the night of the shooting (July 17, 2004), Petitioner and his co-defendants went over the plan, armed themselves, and then went to the apartment complex in Clawson instead of the coffee shop.  When Jaku and his friends arrived at the complex in the minivan, Merko approached the passenger's side of the van and Petitioner approached the driver's side.  Petitioner pulled out a gun, racked it, and pointed it at the van.  As he racked the gun, the van accelerated and Petitioner started shooting at the driver's window.  Carcani did not see a weapon in the hands of the driver or the passenger in the van, and he stated at trial that Petitioner had fired four gunshots.  He also testified that, after the shooting, Petitioner disposed of the handgun and discussed an alibi with his co-defendants and Carcani.  (*Id*. at 67-96; *see also* 2/3/06 Trial Tr., afternoon session, 47-53; 2/6/06 Trial Tr. 14, 20-23.)

Arjan Malushi ("Malushi") was a friend of the defendants as well as a police informant.  He testified at length about many aspects of the case, including the defendants' conversation about the shooting.  (2/9/06 Trial Tr. 131-231; 2/10/06 Trial Tr. 17-157.)

### 2.    *Defense Witnesses*

Neither Petitioner, nor his co-defendants, testified at trial, but they produced four witnesses in their defense: Romeo Toro, Police Officer Brian Honsowetz, Cynthia Bieri, and Police Officer James Kant. Toro testified that he was the owner of the Goodfellows coffee shop and that he and the other victims of the shooting were at Goodfellows on the night of the shooting. Toro explained that the group left Goodfellows in his mother's minivan that night and went to the apartment complex in Clawson to visit some girls. Toro stated that there were no weapons in the van and although there was a metal pipe in the van, it was part of some demolition materials. He did not know how long the pipe had been there. (2/14/06 Trial Tr. 98-105, 146-50.)

Continuing, Toro stated that he owned a small black sports utility vehicle at the time, but that it was probably at home on the night of July 17, 2004. He admitted that, after the shooting at the apartment complex, he lied to the police and did not mention Petitioner's name even though he knew that Petitioner had fired gunshots into the minivan where he and his friends were seated. He explained, however, that he had been shocked, afraid, and fearful of retaliation from the defendants at the time and, that four days after the shooting, he and his friends went to the police station and gave statements. He denied telling the defendants in advance that his group was going to the apartment complex, and he claimed that he had not planned to meet anybody there. (*Id*. at 107-23, 132-38, 145-46.)

10

Officer Honsowetz testified that he was dispatched to the hospital where the victims went after the shooting.  He spoke to two of the five victims and got a description of two perpetrators, but the victims were scared, nervous, upset, and concerned about each other when he interviewed them.  (*Id*. at 179-94.)

Cynthia Bieri testified that she lived in the apartment complex where the shooting occurred and that she heard several gunshots at 11:35 p.m. on July 17, 2004.  She looked out of her window and saw a dark-colored sports utility vehicle with two occupants at the entrance to the complex.  The vehicle remained there for at least fifteen minutes and then left the complex.  (*Id*. at 204-06.)

Officer Kant testified that he spoke with four of the five victims at the hospital on the night of the shooting and got an explanation of what had happened, but no one identified the shooter.  According to Officer Kent, the victims also had no explanation for why someone would shoot at them.  (*Id*. at 211-18.)

Petitioner's defense was that he shot the victims in self-defense because he thought there was an assault weapon in the group's van.  Defense counsel also argued to the jury that the prosecution witnesses were not credible because they lied to the police or had a motive for testifying against Petitioner and that the prosecution failed to prove there was a conspiracy to commit first-degree premeditated murder.  (2/16/06 Trial Tr. 54-90.)

**B.      The Verdict, Sentence, and Direct Appeal**

11

On February 17, 2006, the jury found Petitioner guilty as charged. (2/17/06 Trial Tr. 12-16.) On March 15, 2006, the trial court sentenced Petitioner to two years in prison for the six felony firearm convictions, with jail credit of 596 days, followed by life imprisonment without the possibility of parole for the conspiracy and murder convictions and life imprisonment with the possibility of parole for the assault convictions. (3/15/06 Sent'g Hrg. Tr. 74-75.)

In an appeal as of right, Petitioner argued that: (1) the trial court violated his right to a fair trial by admitting other acts evidence; (2) the trial court deprived him of his right to present a defense by refusing to instruct the jury on self-defense; (3) his attorney unreasonably advised him not to testify; (4) the trial court erred in sentencing him to a nonparolable life sentence for conspiracy to commit first-degree murder; and (5) he was entitled to a hearing on the amount of restitution. On August 29, 2007, the Michigan Court of Appeals remanded Petitioner's case to the trial court for a hearing and decision on the amount of restitution, *People v. Manoku*, No. 270880 (Mich. Ct. App. Aug. 29, 2007), and, on remand, the trial court reduced the amount of restitution.

On March 20, 2008, the Michigan Court of Appeals affirmed Petitioner's convictions in an unpublished, per curiam opinion. The Court of Appeals nevertheless remanded the case to the trial court for correction of the judgment of

sentence to reflect a sentence of life imprisonment with the possibility of parole for the conspiracy conviction.  *Manoku*, No. 270880, 2008 WL 747102, at *1, *5.

Thereafter, Petitioner raised the same five issues that he presented to the Michigan Court of Appeals in an application for leave to appeal in the Michigan Supreme Court.  On July 29, 2008, the Michigan Supreme Court denied leave to appeal because it was not persuaded to the review the issues.  *People v. Manoku*, 482 Mich. 895, 753 N.W.2d 171 (2008) (table).

## C.   The Petition, Stay, State Collateral Proceedings, and Supplemental Pleadings

On April 22, 2009, Petitioner filed his habeas corpus petition in this Court. (ECF No. 1.)  As grounds for relief, Petitioner asserted the same five claims that he presented to the state courts on direct review.  After Respondent filed an answer in opposition to the petition (ECF No. 4), Petitioner moved to hold his habeas petition in abeyance while he pursued additional state remedies, (ECF No. 6).  On April 19, 2010, the Court granted Petitioner's motion and closed this case for statistical purposes.  (ECF No. 8.)

Petitioner subsequently filed a Motion for Relief from Judgment in Oakland County Circuit Court, arguing that the trial court failed to ascertain with certainty that he did not need a bilingual interpreter, that trial counsel was ineffective for failing to request an interpreter, and that appellate counsel was ineffective for failing to raise this issue on direct appeal.  (ECF No. 20-3.)  Petitioner also argued

13

that trial counsel was ineffective for failing to inform the jury of his military history.  (ECF No. 20-5.)  On May 5, 2011, the trial court issued an opinion and order denying Petitioner's motion.  *People v. Manoku*, No. 04-197899-FC (Oakland Cnty. Cir. Ct. May 5, 2011) (unpublished).

Subsequently, Petitioner raised the same two claims in an Application for Leave to Appeal in the Michigan Court of Appeals, which denied his application "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)."  *People v. Manoku*, No. 308018 (Mich. Ct. App. May 8, 2012). Following that denial, Petitioner filed an Application for Leave to Appeal in the Michigan Supreme Court.  He raised the same two issues that he presented to the Michigan Court of Appeals and also argued that appellate counsel neglected to raise strong and critical issues on appeal and that there was good cause for not raising his issues previously.  On October 22, 2012, the Michigan Supreme Court denied leave to appeal because Petitioner "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)."  *People v. Manoku*, 493 Mich. 870, 821 N.W.2d 553 (2012) (table).

On January 24, 2013, Petitioner moved to lift this Court's stay of his habeas case and to amend his petition for writ of habeas petition.  (ECF No. 14.)  On February 5, 2013, the Court granted Petitioner's motion to lift the stay, directed the Clerk of Court to re-open this case, and ordered Respondent to file the

14

supplemental state court record and a response to Petitioner's supplemental brief. (ECF No. 15.)

On April 5, 2013, Respondent filed his Supplemental Answer in Opposition to the Petition for Writ of Habeas Corpus (ECF No. 19), and on July 10, 2013, Petitioner filed his Reply Brief in Support of Petition for Writ of Habeas Corpus (ECF No. 23). Petitioner subsequently filed a Motion to Expand the Record with his affidavit and military records (ECF No. 24), a Motion to Hold an Evidentiary Hearing to establish the factual basis for his claims (ECF No. 25), and a Motion for the Court to Take Judicial Notice of facts regarding foreign-language interpreters for persons with limited English proficiency. (ECF No. 26.) On February 18, 2014, the Court denied Petitioner's motions. (ECF No. 27.)

## II.   STANDARD OF REVIEW

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, 562 U.S. 86, 97, 131 S. Ct. 770, 783 (2011). Pursuant to § 2254, the court may not grant a state prisoner's application for the writ of habeas corpus unless the state court's adjudication of the prisoner's claims on the merits

(1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

15

> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> Under the "contrary to" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 1523 (2000)

(O'Connor, J., opinion of the Court for Part II).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411, 120 S. Ct. at 1522. "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' *Lindh v. Murphy*, 521 U.S. 320, 333, 117 S. Ct. 2059, 2066 (1997), and 'demands that state-court decisions be given the benefit of the doubt,' *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S. Ct. 357, 360 (2002) (per curiam)." *Renico v. Lett*, 559 U.S. 766, 773, 130 S. Ct. 1855, 1862 (2010).

16

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101, 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S. Ct. 2140, 2149 (2004)). To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his claims "was so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103, 131 S. Ct. at 786-87.

## III.   ANALYSIS

### A.   "Other Acts" Evidence

In his first ground for relief, Petitioner alleges that the trial court violated his right to a fair trial by admitting "other acts" evidence. The disputed evidence consisted of testimony regarding two prior incidents involving Petitioner. As explained in more detail by the Michigan Court of Appeals,

> [t]he evidence defendant claims was inadmissible was testimony related to his purported actions before the shooting against two men who were friends with members of the rival group. In the first incident, which occurred in June of 2004, defendant and his codefendant, Edmond Zoica, confronted Kutjim Karapici after a fist fight between Karapici and defendant's friend, Drini Brahimilari. Defendant was alleged to have called a meeting with Karapici at which meeting Zoica pulled a knife and pointed it at Karapici. Defendant pulled a gun, pointed it at Karapici, and fired, but Karapici was not struck by a bullet. In early July of 2004, defendant again called a meeting with Karapici, at which meeting defendant and his codefendant, Oliger Merko, led him past a table full of knives into a

17

plastic-covered room and told him to kneel. Merko placed a pillow and gun to his head and threatened to kill him because of the disrespect Karapici showed their friend Brahimilari. Karapici pleaded for his life and agreed to pay a sum of money in exchange for his release. Defendant's codefendants and others were involved in this first incident. In the second incident, defendant confronted Arian Gashi on July 4, 2004, at the Tirana Café by pointing a gun at Gashi's chest and threatening to kill him because of disrespect showed defendant.

*Manoku*, No. 270880, 2008 WL 747102, at *1.

Petitioner contends that evidence of these prior incidents was irrelevant because it did not prove his intent or knowledge during the charged crimes, and it did not disprove his theory that he acted in self-defense. Petitioner also contends that, even if the evidence were relevant, it was unfairly prejudicial because the prior incidents had no rational connection to the shooting for which he was on trial and because the evidence was meant to show that he was predisposed to commit the crimes. In addition, Petitioner asserts that the prejudicial impact of the evidence greatly outweighed any probative value. The Michigan Court of Appeals disagreed with Petitioner and concluded that the trial court did not abuse its discretion, nor deprive Petitioner of a fair trial, by admitting the evidence.

The United States Court of Appeals for the Sixth Circuit has stated that "alleged errors in evidentiary rulings by state courts are not cognizable in federal habeas review" unless the state's evidentiary rulings were so fundamentally unfair as to rise to the level of a due-process violation. *Moreland v. Bradshaw*, 699 F.3d

18

908, 923 (6th Cir. 2012), *cert. denied*, 134 S. Ct. 110 (2013).  Moreover, "courts 'have defined the category of infractions that violate "fundamental fairness" very narrowly.'"  *Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993) (quoting *Dowling v. United States*, 493 U.S. 342, 352, 110 S. Ct. 668, 674 (1990)).

Admission of the disputed "other acts" evidence in this case was not fundamentally unfair because the trial court instructed the jurors that, if they believed the evidence, they could only consider it to decide whether the evidence tended to show intent, knowledge, preparation, opportunity, or absence of mistake. The trial court warned the jurors not to conclude from the evidence that Petitioner was a bad person or likely to commit crimes or because they thought he was guilty of other bad conduct.  (2/16/06 Trial Tr. 111-12.)

Furthermore, the evidence was relevant to the charges, to the prosecutor's theory, and to the defense asserted.  As explained by the Michigan Court of Appeals:

> both prior incidents recently preceded the shooting and (1) involved members or friends of the rival group who were in the minivan during the shooting, (2) were instigated by defendant and his codefendants, (3) involved defendant pulling [out] a handgun and aiming it at a victim, (4) included threats of death, and (5) arose out of purported disrespect shown for defendant or his friend.  The evidence revealed the animosity between the rival groups and the escalation of that rivalry, creating a context for the shooting and providing a motive for the shooting. The evidence was also relevant:  (1) to establish defendant's intent to kill, which was the culmination of threats to kill members or friends of the rival group using a handgun - acts of the same general category; (2) to the issue of the conspiracy's existence

> arising from this escalating rivalry that involved prior agreements to
> act in a violent manner against members or friends of the rival group;
> (3) to the issue of defendant's knowledge of the conspiracy, including
> the objective to kill members or friends of the rival group and
> defendant's intent to participate cooperatively to further that
> objective; and (4) to defendant's claim of self-defense, demonstrating
> that defendant was the aggressor in prior confrontations with members
> or friends of the rival group.

*Manoku*, No. 270880, 2008 WL 747102, at *3 (internal citations omitted).  As for

the probative value of the evidence, the state appellate court explained that

"[a]lthough the challenged evidence was damaging to defendant's case, the

probative value of the evidence was not substantially outweighed by any danger of

unfair prejudice."  *Id.*

For the reasons given by the Michigan Court of Appeals, and in light of the

trial court's jury instruction on "other acts" evidence, the admission of the "other

acts" evidence was not fundamentally unfair and, therefore, did not deprive

Petitioner of due process.  Moreover, "[t]here is no clearly established Supreme

Court precedent which holds that a state violates due process by permitting

propensity evidence in the form of other bad acts evidence."  *Bugh v. Mitchell*, 329

F.3d 496, 512 (6th Cir. 2003).  Consequently, "there is no Supreme Court

precedent that the trial court's decision could be deemed 'contrary to' under

AEDPA."  *Id.* at 513.  Petitioner's personal disagreement with the state court's

ruling on other "other acts" evidence "is not cognizable on federal habeas review,

inasmuch as it involves no constitutional dimension."  *Bey v. Bagley*, 500 F.3d

514, 523 (6th Cir. 2007).  The Court therefore denies relief on Petitioner's first claim.

**B.      The Trial Court's Refusal to Instruct the Jury on Self-Defense**

Petitioner alleges next that the trial court deprived him of his right to present a defense by refusing to instruct the jury on self-defense.  The Michigan Court of Appeals adjudicated this claim on direct review and concluded that the trial court did not abuse its discretion when denying Petitioner's request for an instruction on self-defense because the elements of self-defense were "wholly lacking."  *Manoku*, No. 270880, 2008 WL 747102, at *4.

### *1.      Clearly Established Federal Law*

A defendant in a criminal prosecution is entitled to "a meaningful opportunity to present a complete defense."  *California v. Trombetta*, 467 U.S. 479, 485, 104 S. Ct. 2528, 2532 (1984).  "A necessary corollary of this holding is the rule that a defendant in a criminal trial has the right, under appropriate circumstances, to have the jury instructed on his or her defense, for the right to present a defense would be meaningless were a trial court completely free to ignore that defense when giving instructions."  *Taylor v. Withrow*, 288 F.3d 846, 852 (6th Cir. 2002).

"[A] defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor."

21

*Mathews v. United States*, 485 U.S. 58, 63-64, 108 S. Ct. 883, 887 (1988). "The

failure to give a requested self-defense instruction, however, does not deprive the

defendant of his constitutional right to due process if the evidence produced during

trial was insufficient to warrant such an instruction." *Allen v. Morris*, 845 F.2d

610, 617 (6th Cir. 1988) (citing *Melchior v. Jago*, 723 F.2d 486, 493-94 (6th Cir.

1983)).

### 2.    *Application*

Generally, in Michigan,

> the killing of another person in self-defense by one who is free from
> fault is justifiable homicide if, under all the circumstances, he
> honestly and reasonably believes that he is in imminent danger of
> death or great bodily harm and that it is necessary for him to exercise
> deadly force.  The necessity element of self-defense normally requires
> that the actor try to avoid the use of deadly force if he can safely and
> reasonably do so, for example by applying nondeadly force or by
> utilizing an obvious and safe avenue of retreat

*People v. Riddle*, 467 Mich. 116, 119, 649 N.W.2d 30, 34 (2002) (footnotes

omitted).  "[O]ne who is an initial aggressor (i.e., one who is the first to use deadly

force against the other), . . . is generally not entitled to use deadly force in self-

defense."  *Id*. at 120, 649 N.W.2d at 35.

Petitioner's attorney was permitted to argue that Petitioner acted in self-

defense, but the trial court refused to instruct the jury on self-defense.  (2/16/06

Trial Tr. 9-14.)  This was an objectively reasonable decision because there was

evidence that Petitioner was the aggressor on the night of the shooting and that the

22

shooting was unjustified.  The evidence, as described by the Michigan Court of

Appeals, established that

> the minivan drove slowly into the parking lot with its headlights on,
> defendant and codefendant Merko approached the minivan, defendant
> pulled a handgun out, racked it, and began shooting at close range.
> The medical examiner testified that Markiol Jaku, who was killed in
> the shooting, had stippling injuries to the left side of his face which
> was consistent with a shot being fired at close range while Jaku was
> seated in the driver's seat with his arms extended forward toward the
> steering wheel. There was no evidence of any arguing or threatening
> behavior preceding the shooting.  There was no evidence that the
> people in the minivan pointed or fired a gun at defendant and, in fact,
> they did not even return fire in response to the shooting.  And, even as
> the minivan was accelerating out of the parking lot, defendant
> continued shooting directly at the minivan, striking the victims.

*Manoku*, No. 270880, 2008 WL 747102, at *4.

Although Florjon Carcani testified that Merko said he saw an assault rifle in

the victims' minivan, Carcani himself denied seeing an assault rifle or weapon in

the van.  (2/3/06 Trial Tr., afternoon session, 53-54.)  And even though Arjan

Malushi testified that Zoica had informed him the defendants saw an assault rifle in

the minivan, got scared, and would have been dead if Petitioner had not fired his

gun, Malushi admitted that he did not know whether Zoica was telling the truth

when he made those comments.  (2/10/06 Trial Tr. 149-52.)

Even assuming there was an assault rifle in the minivan, there was no

evidence that any of the victims pointed the rifle at the defendants, threatened the

defendants with the rifle, or even held the rifle.  To the extent Petitioner thought

his and his co-defendants' lives were in danger, his belief was unreasonable, therefore depriving him of the ability to invoke a defense of self-defense.

The record also indicates that Jaku was shot from behind (1/30/06 Trial Tr. 28, 46), and that Dibra was shot in the back.  (2/2/06 Trial Tr. 182.)  These additional facts suggest that the shooting was not done in self-defense, as does the fact that the testimony at trial established that shots were not fired until the minivan started moving toward the exit of the parking lot.

The Court concludes that the evidence at trial did not warrant a jury instruction on self-defense.  The trial court therefore did not deprive Petitioner of his constitutional right to defend himself or his right to appropriate jury instructions by refusing to instruct the jury on self-defense.  And because the state appellate court's decision on Petitioner's claim was objectively reasonable, Petitioner has no right to habeas relief on his second claim.

## C.    Advice Not to Testify

In his third habeas claim, Petitioner alleges that his trial attorney unreasonably advised him not to testify on his own behalf.  Petitioner claims that his attorney's advice deprived him of an opportunity to demonstrate that he acted in self-defense when he saw the rival group with firearms, noticed that they were dressed for a drive-by shooting (i.e., that the individuals in the minivan were clad in all black clothing and donning black facemasks), and feared for his co-

24

defendants' lives.  The Michigan Court of Appeals adjudicated this claim on direct appeal and rejected it for several reasons.  The Court of Appeals stated that the issue was not preserved for appellate review, that Petitioner's intentional waiver of the right to testify extinguished the error, and that the issue lacked merit.  *Manoku*, No. 270880, 2008 WL 747102, at *4.

### 1.    *Clearly Established Federal Law*

"[A] defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense."  *Rock v. Arkansas*, 483 U.S. 44, 49, 107 S. Ct. 2704, 2708 (1987).  This right "is personal to the defendant, may be relinquished only by the defendant, and the defendant's relinquishment of the right must be knowing and intentional."  *United States v. Webber*, 208 F.3d 545, 550-51 (6th Cir. 2000) (citing *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993)).  "[W]hen a tactical decision is made not to have the defendant testify, the defendant's assent is presumed."  *Id*. at 551 (citing *Joelson*, 7 F.3d at 177).

### 2.    *Application*

At the close of the prosecutor's proofs in this case, Petitioner unequivocally waived his right to testify.  He acknowledged on the record that his attorney had discussed the constitutional right to testify with him.  He then stated that he had decided not to take advantage of the right and that it was his decision alone not to testify.  He assured the trial court that he had made the decision after counseling

25

with his attorney and that the decision was his own independent decision.  (2/14/06 Trial Tr. 84-85.)

Although Petitioner claims that his waiver of the right to testify was based on his attorney's unreasonable advice not to testify,

> [a] defendant who wants to testify can reject defense counsel's advice to the contrary by insisting on testifying, communicating with the trial court, or discharging counsel.  *Joelson*, 7 F.3d at 177.  At base, a defendant must "alert the trial court" that he desires to testify or that there is a disagreement with defense counsel regarding whether he should take the stand.  *Pelzer [v. United States*, 105 F.3d 659 (table), 1997 WL 12125, at *2 (6th Cir. Jan. 13, 1997)].

*Webber*, 208 F.3d at 551.

Petitioner took none of these actions.  He did not insist on testifying, inform the trial court that he wanted to testify and disagreed with his attorney, or fire his attorney.  "When a defendant does not alert the trial court of a disagreement, waiver of the right to testify may be inferred from the defendant's conduct. Waiver is presumed from the defendant's failure to testify or notify the trial court of the desire to do so."  *Id*. (citing *Joelson*, 7 F.3d at 177).

Furthermore, defense attorneys are "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Strickland v. Washington*, 466 U.S. 668, 690, 104 S. Ct. 2052, 2066 (1984).  And the advice not to testify in this case apparently was tactical because Petitioner alleges that his attorney was concerned about the

26

introduction of "other acts" evidence and he thought that the trial court would give a jury instruction on self-defense.  In light of the tactical decision not to have Petitioner testify, Petitioner's assent is presumed.  *Webber*, 208 F.3d at 551. Petitioner's "present allegations that he wanted to testify and was prevented from doing so do not suffice to overcome the presumption that he assented to the tactical decision that he not testify."  *Hodge v. Haeberlin*, 579 F.3d 627, 639 (6th Cir. 2009).

Even if defense counsel's performance was deficient, Petitioner was not prejudiced by the advice not to testify.  Although he claims that he would have testified that he acted in self-defense, there was abundant evidence that Petitioner and his co-defendants planned the shooting, that Petitioner armed himself before the shooting, and that he was the aggressor in the parking lot encounter.  It was undisputed that he was the individual who fired the gunshots and that at least two of the victims were shot from behind.  Further, and as the state appellate court noted,

> Carcani testified that after the shooting codefendant Merko said he saw an assault rifle in the minivan.  And [] Malushi testified that after the shooting, codefendant Zoica went to Malushi's house and told him that they did not expect the rival group to show up that night and when they arrived, the rival group had on black clothing, black hats, black masks, and sunglasses.  Zoica also told Malushi that he had seen an assault rifle in the minivan.  Therefore, evidence in support of defendant's claim of 'self-defense' was before the jury without the risks associated with cross-examination.

27

*Manoku*, No. 270880, 2008 WL 747102, at *5.

Because the evidence did not support a finding that Petitioner acted in self-defense, trial counsel was not ineffective for allegedly discouraging Petitioner from testifying, and the allegedly deficient performance did not prejudice the defense, primarily because Petitioner would not have received a self-defense instruction even if he had testified in his defense at trial.

Petitioner has no right to habeas relief on the basis that trial counsel unreasonably advised him not to testify, as the Michigan Court of Appeals did not unreasonably apply *Strickland*.  The Court therefore denies relief on Petitioner's third claim.

**D.    The Sentence for Conspiracy and the Restitution Order**

In his fourth claim, Petitioner alleges that the trial court erroneously sentenced him to life imprisonment without the possibility of parole for conspiracy to commit first-degree murder.  And in his fifth claim, Petitioner alleges that the state trial court erred by ordering him to pay restitution in the amount of $85,022.34 without holding a hearing when he disputed the amount of restitution.

Respondent points out that the Michigan Court of Appeals remanded Petitioner's case to correct the judgment of sentence and that the restitution issue was resolved when the Court of Appeals remanded Petitioner's case for a hearing on the amount of restitution.  *Manoku*, No. 270880, 2008 WL 747102, at *5

28

(remanding the case for correction of the judgment of sentence and noting that

Petitioner's claim regarding entitlement to a restitution hearing was resolved by the

Court's prior order  remanding the case for such a hearing); *Manoku*, No. 270880

(Mich. Ct. App. Aug. 29, 2007) (order remanding the case to the trial court for a

hearing and a decision resolving the dispute over the amount of restitution);

*Manoku*, No. 04-197889-FC (Oakland Cnty. Cir. Ct. May 5, 2011) (opinion and

order noting that, on remand the trial court reduced the amount of restitution to

$68,077.86).  Petitioner concedes in his reply to Respondent's supplemental

answer that both issues have been resolved and that neither his fourth nor fifth

claim should have been included in his habeas petition.  (Reply Br. in Support of

Pet. for Writ of Habeas Corpus 20-21.)  Because Petitioner has abandoned his

fourth and fifth claims regarding his sentence and the amount of restitution, the

Court need not address them.

## E.    The Alleged Lack of an Interpreter and Alleged Failure to Present a Defense

In his sixth habeas claim, Petitioner alleges that the trial court failed to

ascertain with any certainty that he did not need an interpreter to understand the

nature of the charges against him and the consequences of the court proceedings.

Petitioner further alleges that his trial attorney was ineffective for failing to request

appointment of an interpreter and that appellate counsel was ineffective for failing

to raise this issue on appeal.  In his seventh, and final claim, Petitioner argues that

his trial attorney was ineffective for failing to inform the jury about his service in the Albanian special forces.  Petitioner contends that his military history would have explained why he reacted as he did on July 17, 2004, by firing multiple gunshots at the rival group.  Respondent argues in his supplemental answer that habeas claims six and seven are procedurally defaulted.

### 1. *Procedural Default*

A procedural default is "a critical failure to comply with state procedural law." *Trest v. Cain*, 522 U.S. 87, 89, 118 S. Ct. 478, 480 (1997).  The related doctrine prohibits a federal court from reviewing the merits of a habeas petitioner's claims, including constitutional claims, if a state court declined to hear the claims because the prisoner failed to abide by a state procedural rule.  *Martinez v. Ryan*, 132 S. Ct. 1309, 1316 (2012).  In this Circuit,

> "[a] habeas petitioner's claim will be deemed procedurally defaulted if each of the following four factors is met:  (1) the petitioner failed to comply with a state procedural rule; (2) the state courts enforced the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; and (4) the petitioner has not shown cause and prejudice excusing the default."  [*Jalowiec v. Bradshaw*, 657 F.3d 293, 302 (6th Cir. 2011)].  To determine whether a state procedural rule was applied to bar a habeas claim, [courts] look "to the last reasoned state court decision disposing of the claim."  *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010) (*en banc*).

*Henderson v. Palmer*, 730 F.3d 554, 560 (6th Cir. 2013).

30

The state procedural rule in question here is Michigan Court Rule 6.508(D)(3), which prohibits state courts from granting relief from judgment if a defendant could have raised his claims on appeal from his judgment or sentence. An exception exists if the defendant shows "good cause" for his or her failure to raise the claims on appeal and "actual prejudice from the alleged irregularities that support the claim for relief." Mich. Ct. R. 6.508(D)(3)(a) & (b).

a.    *The First Factor*

Petitioner violated Rule 6.508(D)(3) by first raising his sixth and seventh claims in his motion for relief from judgment rather than on direct appeal from his convictions. Thus, the first factor is satisfied.

b.    *The Second Factor*

The second factor is satisfied because the last state court to review Petitioner's claim in a reasoned opinion was the trial court, which enforced Rule 6.508(D)(3). The trial court cited the rule, explained the rule, and ultimately concluded that Petitioner had failed to show "good cause" for not raising his claims on appeal and "actual prejudice." Regarding Petitioner's claim about an interpreter, the trial court stated that Petitioner had "satisfied neither the good cause nor the actual prejudice prong of the two-prong standard of MCR 6.508(D)(3)," and, therefore, the court could not grant relief on that claim. *Manoku*, No. 04-197899-FC (Oakland Cnty. Cir. Ct. May 5, 2011) (Op. & Order

31

Denying Pet'r's Mot. Rel. J. 5.)  The trial court reached the same conclusion on

Petitioner's claim that trial counsel was ineffective for failing to present evidence

of his prior military service.  *Id.* at 6-7.

Petitioner argues that his claims are not procedurally defaulted because the

state court cited Michigan Court Rule 6.509(D)(3)(b), not Rule 6.508(D)(3)(b), in

its decision.  *Id.* at 5.  But this appears to have been a mere typographical error,

because there is no Rule 6.509(D)(3)(b) and because the trial court cited

6.508(D)(3) five other times in its order.

Petitioner further argues that his claims are not procedurally defaulted

because the trial court's decision was a merits determination.  While it is true that

the trial court did address the merits of Petitioner's two claims, this "does not

require [the Court] to disregard the state court's finding of procedural bar."  *Coe v.*

*Bell*, 161 F.3d 320, 330 (6th Cir. 1998).  As explained in *Harris v. Reed*, 489 U.S.

255, 109 S. Ct. 1038 (1989):

> a state court need not fear reaching the merits of a federal claim in an
> *alternative* holding.  By its very definition, the adequate and
> independent state ground doctrine requires the federal court to honor a
> state holding that is a sufficient basis for the state court's judgment,
> even when the state court also relies on federal law.  *See Fox  Film*
> *Corp. v. Muller*, 296 U.S. 207, 210, 56 S. Ct. 183, 184, 80 L. Ed. 158
> (1935). Thus, by applying this doctrine to habeas cases, [*Wainwright*
> *v. Sykes*, 433 U.S. 72, 97 S. Ct. 2497 (1977)] curtails reconsideration
> of the federal issue on federal habeas as long as the state court
> explicitly invokes a state procedural bar rule as a separate basis for
> decision.  In this way, a state court may reach a federal question
> without sacrificing its interests in finality, federalism, and comity.

*Id*. at 264, 109 S. Ct. at 1044 (emphasis in original).

Here, in addition to addressing the merits of Petitioner's claims, the trial court relied on Rule 6.508(D)(3) and enforced the rule. Therefore, the second procedural-default factor is satisfied.

### c.    The Third Factor

The third procedural default factor is satisfied if the state procedural rule in question was an adequate and independent state ground for denying review of a federal constitutional claim. The Sixth Circuit has determined that the procedural bar in Rule 6.508(D) is an adequate and independent state ground on which Michigan courts may rely in foreclosing review of federal claims. *Howard v. Bouchard*, 405 F.3d 459, 477 (6th Cir. 2005) (citing *Simpson v. Jones*, 238 F.3d 399, 407-08 (6th Cir. 2000), and *Munson v. Kapture*, 384 F.3d 310, 315 (6th Cir. 2004)). Consequently, the third factor is satisfied.

### 2.    "Cause"

The fourth and final factor is whether Petitioner has shown "cause" for his failure to raise his last two claims on direct appeal and prejudice from the alleged irregularities that support his claims. Petitioner alleges that his appellate attorney's ineffectiveness was the reason he did not raise his claims in the appeal as of right.

Under federal law, an appellate attorney's failure "to raise an issue on appeal can amount to constitutionally ineffective assistance." *Jalowiec*, 657 F.3at 321.

33

But an appellate attorney is not required to raise every non-frivolous claim

requested by his or her client if counsel decides, as a matter of professional

judgment, not to raise the claim.  *Jones v. Barnes*, 463 U.S. 745, 751, 103 S. Ct.

3308, 3312 (1983).

> In fact, the process of "'winnowing out weaker arguments on appeal'"
> is "the hallmark of effective appellate advocacy."  *Smith v. Murray*,
> 477 U.S. 527, 536, 106 S. Ct. 2661, 91 L.Ed.2d 434 (1986) (quoting
> *Barnes*, 463 U.S. at 751-52, 103 S. Ct. 3308).  "Generally, only when
> ignored issues are clearly stronger than those presented, will the
> presumption of effective assistance of counsel be overcome."  *Gray v.
> Greer*, 800 F.2d 644, 646 (7th Cir. 1986).

*Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002).  To demonstrate that

appellate counsel was ineffective, a habeas petitioner must show (1) that his

attorney acted unreasonably in failing to discover and raise nonfrivolous issues on

appeal and (2) there is a reasonable probability that he would have prevailed on

appeal were it not for his appellate attorney's failure to raise the issues.  *Smith v.

Robbins*, 528 U.S. 259, 285, 120 S. Ct. 746, 764 (2000) (citing *Strickland*, 466

U.S. at 687-91, 694, 104 S. Ct. at 2052).  "[T]o assess the claim of ineffective

assistance of appellate counsel as an excuse for defaulting the underlying claim[s],

[courts] may look to the strength of the underlying claim[s]."  *Moore v. Mitchell*,

708 F.3d 760, 778 (6th Cir.) (citing *Davie v. Mitchell*, 547 F.3d 297, 312 (6th Cir.

2008)), *cert. denied*, 134 S. Ct. 693 (2013).  With this in mind, the Court looks to

Petitioner's underlying claims about a bilingual interpreter and his military records.

34

      a.     *The Alleged Failure to Make a Determination about an*
            *Interpreter*

Petitioner alleges that the trial court failed to ascertain with certainty

whether he needed an interpreter.  Petitioner further alleges that his trial attorney

was ineffective for failing to request appointment of an interpreter.  At a pretrial

hearing, however, the prosecutor stated that all the defendants spoke English, and

both Petitioner's attorney and counsel for co-defendant Merko appeared to reject

the idea that each defendant needed an interpreter.[4]  Although counsel for co-

---

[4] The transcript reads in relevant part as follows:

[Counsel for Zoica]:  Also, Judge, we're going to need interpreters.
There are going to be --

THE COURT:  That's a good point and that's one other thing we
should talk about in the status conference.  We need – I suspect we're
going to need three interpreters for you three --

    [Counsel for Merko]:  No,  no.

    [The prosecutor]:  Your Honor, they all speak English --

    [Counsel for Petitioner]:  No - -

[Counsel for Zoica]:  Hold on, hold on.  There's going to be some
Albanian witnesses.  The witnesses should have their own interpreter,
a generic one that's not related to our guys.  As far as us three guys
are concerned, I'd accept only one interpreter, if you'll give it to us.

    THE COURT:  We'll use the certified list of Oakland
    County.

(Matter adjourned at 4:35 p.m.)

defendant Zoica requested an interpreter, he indicated that an interpreter was needed for some of the Albanian witnesses, and that one interpreter for the witnesses and one for the defendants would be acceptable.  The trial court then agreed to request an interpreter.  (12/13/05 Hr'g Tr. 49-50).

At a subsequent pretrial hearing, the trial court asked Petitioner his name and whether he agreed to waive his presence when his co-defendants' juries were selected. Petitioner responded by telling the trial court his name and answering, "Yes, Your Honor" to the question about whether he was waiving his presence when the other two juries were chosen.  (12/20/05 Hr'g Tr. 7.)  Petitioner gave no indication that he had any trouble understanding the trial court.

The trial court, moreover, stated in its order on Petitioner's motion for relief from judgment that, according to the court's financial records, at least one interpreter was present in the courtroom throughout the proceedings.  The transcript of trial confirms that an interpreter was present at least some of the time.[5] It therefore appears that an interpreter was readily available to assist Petitioner if he needed help in understanding his attorney or the court proceedings.  Although

---

(12/13/05 Hr'g Tr. 49-50.)

[5] Ilirjan Dibra spoke some English, but testified at trial through an interpreter.  (2/2/06 Trial Tr., 168-71.)  An interpreter also assisted prosecution witness Arben Dinkollari, who stated that he wished to testify in Albanian (2/7/06 Trial Tr. 210-11), and Carconi was offered an interpreter at one point during his testimony.  (2/3/06 Trial Tr., afternoon session, 63.)

36

he apparently could not write in English, the trial court pointed out in its ruling on

Petitioner's post-conviction motion that there was no indication Petitioner was

unable to speak or to understand English. *Manoku*, No. 04-197899-FC (Oakland

Cnty. Cir. Ct. May 5, 2011) (Op. & Order Denying Pet'r's Mot. Rel. J. 5.)

Petitioner has failed to demonstrate that he needed an interpreter and that

trial counsel was ineffective for failing to request appointment of an interpreter for

him.  Consequently, appellate counsel was not ineffective for failing to raise

Petitioner's sixth claim in the appeal of right.  "Omitting meritless arguments is

neither professionally unreasonable nor prejudicial."  *Coley v. Bagley*, 706 F.3d

741, 752 (6th Cir.), *cert denied*, 134 S. Ct. 513 (2013).

> b.   *The Failure to Inform the Jury about Petitioner's Military
>      Service*

In his seventh claim, Petitioner alleges that his trial attorney was ineffective

for failing to inform the jury that Petitioner served in the Albanian Special Forces.

Petitioner contends that this evidence would have demonstrated that, on the night

of the shooting, he acted out of a conditioned response he learned in the military.

The state trial court noted on review of this claim that, according to the

presentence investigation report, Petitioner's military service consisted of working

on airplanes. *Manoku*, No. 04-197899-FC (Oakland Cnty. Cir. Ct. May 5, 2011)

(Op. & Order Denying Pet'r's Mot. Rel. J. 6).  The trial court reasonably

concluded that this information would have added nothing to Petitioner's claim of

self-defense.  Consequently, Petitioner's trial attorney was not ineffective for

failing to inform the jury about Petitioner's military history, and appellate counsel

was not ineffective for failing to raise a claim about trial counsel's alleged

ineffectiveness.  The Supreme Court "has never required defense counsel to pursue

every claim or defense, regardless of its merit, viability, or realistic chance for

success."  *Knowles v. Mirzayance*, 556 U.S. 111, 123, 129 S. Ct. 1411, 1420

(2009).

> c.      *Conclusion*

For the reasons above, the Court concludes that Petitioner's underlying

claims about an interpreter and military history lack merit and are not clearly

stronger than the claims he presented on direct appeal.  Thus, appellate counsel's

performance was not deficient. "Appellate counsel cannot be . . . ineffective for

'failure to raise an issue that lacks merit.'"  *Shaneburger v. Jones*, 615 F.3d 448,

452 (6th Cir. 2010) (quoting *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001)).

 Furthermore, there is not a substantial probability that Petitioner would have

prevailed on appeal if his attorney had raised his sixth and seventh claims on direct

rewview.  It follows that appellate counsel's performance did not prejudice the

defense and was therefore not "cause" for Petitioner's procedural default.

> **3.      *Miscarriage of Justice***

Having determined that "cause" does not exist to excuse Petitioner's procedural default, the Court need not decide whether Petitioner suffered any prejudice from the claimed errors. *Carter v. Mitchell*, 443 F.3d 517, 538 (6th Cir. 2006) (citing *Lott v. Coyle*, 261 F.3d 594, 609 (6th Cir. 2001)). In the absence of "cause and prejudice," Petitioner can prevail on his procedurally defaulted claims only if he "demonstrate[s] that the failure to consider [his claims] will result in a fundamental miscarriage of justice. A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'" *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citing *Murray v. Carrier*, 477 U.S. 478, 496, 106 S. Ct. 2639 (1986)). To be credible, however, "such a claim requires [the] petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324, 115 S. Ct. 851, 865 (1995). "A petitioner's burden at th[is] gateway stage is to demonstrate that more likely than not, in light of the new evidence . . . any reasonable juror would have reasonable doubt." *House v. Bell*, 547 U.S. 518, 538, 126 S. Ct. 2064, 2077 (2006).

Petitioner has not produced any new evidence of actual innocence, and the evidence against him at trial was overwhelming. Therefore, a miscarriage of justice will not result from the Court's failure to address the substantive merits of

39

habeas claims six and seven.  Those claims are procedurally defaulted and do not require an adjudication on the merits.

## IV.   CERTIFICATE OF APPEALABILITY

Before Petitioner may appeal this Court's decision, a certificate of appealability must issue.  28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b)(1).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604 (2000).  "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Id.* at 484, 120 S. Ct. at 1604.

Having considered the matter, the Court concludes that reasonable jurists could not debate the correctness of the Court's assessment of Petitioner's first five

claims.  Reasonable jurists also would not find the Court's procedural ruling on claims six and seven debatable.  Nor would reasonable jurists conclude that those grounds for relief state a valid claim of the denial of a constitutional right. Accordingly, a certificate of appealability shall not issue.  However, because an appeal could be taken in good faith, Petitioner may proceed *in forma pauperis* on appeal should he choose to seek a certificate of appealability from the United States Court of Appeals for the Sixth Circuit.  28 U.S.C. § 1915(a)(3).

## V.    CONCLUSION

For the reasons set forth herein, the Court concludes that Petitioner is not entitled to the relief he seeks.  With respect to the merits of the first five claims set forth in the petition, the state appellate court's adjudication of Petitioner's claims was not contrary to, nor did it involve an unreasonable application of, clearly established Supreme Court precedent. With respect to claims six and seven, the Court concludes that review of Petitioner's claims is barred because Petitioner has failed to demonstrate cause to excuse his state-court procedural default.  Because Petitioner has not demonstrated that he is being held in violation of his constitutional rights, he is not entitled to the issuance of the writ of habeas corpus.

Accordingly,

**IT IS ORDERED** that the Petition for Writ of Habeas Corpus (ECF No. 1), as supplemented by Petitioner's reply brief (ECF No. 23), is **DENIED**.

41

**IT IS FURTHER ORDERED** that a certificate of appealability **SHALL NOT ISSUE** but that Petitioner may proceed *in forma pauperis* should he seek a certificate of appealability in the appellate court.

Dated: August 7, 2015

s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:

**Ketjol Manoku**, #597394
Alger Maximum Correctional Facility
N6141 Industrial Park Drive
Munising, Michigan 49862

**Bruce H. Edwards, A.A.G.**
**Mark G. Sands, A.A.G.**